ROBERTS v AUTO-OWNERS INSURANCE COMPANY

Docket No. 72861. Argued April 2, 1985 (Calendar No. 2).—Decided October 1, 1985.

Delores Roberts, for herself and as next friend of Christine Rodzos, her minor daughter, and Ralph Roberts brought an action in the St. Clair Circuit Court against Auto-Owners Insurance Company, seeking recovery of no-fault benefits for replacement services and damages for mental anguish and exemplary or punitive damages on the ground that Auto-Owners' conduct was improper, outrageous, or malicious in processing and denying claims for benefits for injuries suffered by Christine when she was struck by a motor vehicle while riding her bicycle. The court, James T. Corden, J., entered judgment on a jury verdict for the plaintiffs, awarding a portion of the replacement benefits claimed and $2,500 in mental distress damages. The Court of Appeals, T. M. Burns, P.J., and D. F. Walsh and Simon, JJ., affirmed in an opinion per curiam (Docket No. 64515). The defendant appeals.

In an opinion by Justice Boyle, joined by Justices Ryan, Brickley, Cavanagh, and Riley, the Supreme Court held:

The plaintiffs failed to meet the threshold requirements of proof to make out a prima facie case of intentional infliction of emotional distress. Thus, the issue whether the tort may be formally adopted into the jurisprudence of Michigan may not be reached.

1. The Restatement of Torts, 2d, provides that a person who, by extreme and outrageous conduct, intentionally or recklessly causes another severe emotional distress is subject to liability for the tort of intentional infliction of emotional distress. Four elements are necessary to make out a prima facie case of intentional infliction of emotional distress: extreme and outra-

---

References for Points in Headnotes

[1, 2] Am Jur 2d, Automobile Insurance § 358.

    Validity and construction of "no-fault" automobile insurance plans. 42 ALR3d 229.

[2] What constitutes sufficiently serious personal injury, disability, impairment, or the like to justify recovery of damages outside of no-fault automobile insurance coverage. 33 ALR4th 767.

geous conduct, intent or recklessness, causation, and severe emotional distress. The conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community. The liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. In a contractual setting, an action in tort for intentional infliction of emotional distress must rest on a breach of a duty distinct from the contract.

2. In this case, the plaintiffs failed to present sufficient proof to make out a prima facie claim of intentional infliction of emotional distress. The plaintiffs alleged no more than the failure of the defendant to facilitate the filing of a replacement services claim and the denial of benefits owed. While such conduct may be considered unreasonable, it is not conduct which would be considered tortiously outrageous. There was no indication that Auto-Owners set out to harass the plaintiffs; nor was a course of conduct shown that could be characterized as so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community. At most, Auto-Owners' conduct would constitute bad faith, justifying the assessment of penalties under the no-fault act for overdue payments and the plaintiffs' attorney fees. The plaintiffs' anger is more consistent with that which accompanies the breach of a contractual obligation. There was no evidence of grief, depression, disruption of life style, or of treatment for anxiety or depression. The distress proved by the plaintiffs was, as a matter of law, insufficient to state a cause of action for the intentional infliction of emotional distress.

Chief Justice WILLIAMS, concurring, would recognize the tort of intentional infliction of emotional distress.

Justice LEVIN wrote separately, questioning whether recognition of another cause of action, intentional infliction of emotional distress, is the most efficacious means of addressing the problem of unjustified litigation. Recognition of the cause of action would increase the burden of litigation and randomly provide fortuitous compensation in isolated cases. Instead, the court rule providing for sanctions for unjustified litigation should be enlarged to provide compensation for all pecuniary loss resulting from such litigation, and notice should be given that trial courts are expected to enforce the rule and that litigants who can show failure to enforce can obtain relief on appeal.

Reversed.

135 Mich App 595; 354 NW2d 271 (1983) reversed.

OPINION OF THE COURT

1. TORTS — INSURANCE — NO-FAULT — INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS.

Allegations of a failure by a no-fault insurer to facilitate the
filing of a claim for replacement services and the denial of
benefits owed were insufficient to state a cause of action for
intentional infliction of emotional distress where the insurer's
conduct, while unreasonable or amounting to bad faith justify-
ing imposition of penalties under the no-fault act, was not
tortiously outrageous and the plaintiffs' distress was more
consistent with anger accompanying the breach of a contrac-
tual obligation (MCL 500.3142[3], 500.3148[1]; MSA 24.13142[3],
24.13148[1]).

SEPARATE OPINION BY LEVIN, J.

2. TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS — DAM-
AGES — COURT RULES.

*The remedy for damages resulting from the maintenance of an
unjustified lawsuit should be enhanced by expanding the power
of a trial court to assess actual costs to include the total
amount of actual pecuniary loss, including all fees and adminis-
trative charges because of the litigation as well as attorney fees
and an additional sum for loss of income-producing time or
business attributed to the wrongful maintenance of the action
(MCR 2.114[D], [E]).*

*Bush, Luce, Henderson, Bankson & Heyboer* (by
*S. Keith Bankson*) for the plaintiffs.

*Law Office of W. J. Drillock* (by *David W.
Hearsch*) for the defendant.

Amici Curiae:

*Dickinson, Brandt, Hanlon, Becker & Lanctot*
(by *Charles T. McCutcheon*) (*Gromek, Bendure &
Thomas,* by *Carl L. Gromek* and *Nancy L. Bosh,* of
counsel) for Auto Club Insurance Association.

*Donovan, Hammond, Ziegelman, Roach & Soti-
roff, P.C.* (by *Thomas A. Roach* and *Mark C. Lahti*),

and *Joseph W. Murray,* Assistant General Counsel, Blue Cross and Blue Shield of Michigan, for Blue Cross and Blue Shield of Michigan.

*Joan Lovell* for Michigan Trial Lawyers Association.

*Eggenberger, Eggenberger, McKinney & Weber, P.C.* (by *William D. Eggenberger* and *Paul D. Hofmeister*), for State Farm Mutual Automobile Insurance Company.

BOYLE, J. Our order granting leave to appeal in this case directed the parties to brief the following two issues:

> (1) whether the tort of intentional infliction of emotional distress exists in this jurisdiction; and, if so,
> (2) whether plaintiffs adequately pled and proved an intentional infliction of emotional distress. [419 Mich 933 (1984).]

Since we conclude that plaintiff failed even to meet the threshold requirements of proof to make out a prima facie claim of intentional infliction of emotional distress, we are constrained from reaching the issue as to whether this modern tort should be formally adopted into our jurisprudence by the well-settled rule that statements concerning a principle of law not essential to determination of the case are obiter dictum[1] and lack the force of an

---

[1] Since we agree with Justice LEVIN that "unjustified litigation" is a vice, and that "[o]nly by deciding specific cases can this Court give meaning to the words 'intentional and outrageous conduct,'" we decline to yield to the temptation of engaging in a full blown discourse on the relative merits of the tort of intentional infliction of emotional distress or of a remedy for containing unfounded hypothetical future cases involving insurance practices. Any "boundaries or guidelines for the bench or bar" which might result from such obiter

adjudication, *McNally v Wayne County Canvassers,* 316 Mich 551; 25 NW2d 613 (1947).

## I

Plaintiffs Delores and Ralph Roberts brought this action, individually and on behalf of their minor daughter, Christine Rodzos, seeking recovery of certain no-fault benefits from their no-fault insurer, defendant Auto-Owners Insurance Company. The claims arose when Christine was struck by a motor vehicle while riding her bicycle, resulting in her hospitalization for several days and her missing of school for a total of three weeks. Auto-Owners paid plaintiffs' medical and ambulance bills. The instant lawsuit concerns only plaintiffs' claim for replacement benefits under MCL 500.3107(b); MSA 24.13107(b).[2] In a separate paragraph of the complaint, plaintiffs also claimed damages for "mental anguish" and "exemplary or punitive damages" for Auto-Owners' conduct, alleged to be "improper and/or outrageous and/or malicious" in the following respects:

On or about July 19, 1979, Plaintiff made appli-

dictum in this case would yield only transitory and illusory assistance to the bench and bar. We note that recently adopted MCR 2.114 addresses the imposition of sanctions by trial courts. The trial bench and bar's implementation of this rule will provide this Court with the necessary experience to assess the need for further remedies.

[2] The section provides, in relevant part:

"Personal protection insurance benefits are payable for the following:

*  *  *

(b) Work loss consisting of loss of income from work an injured person would have performed during the first 3 years after the date of the accident if he had not been injured and expenses not exceeding $20.00 per day, reasonably incurred in obtaining ordinary and necessary services in lieu of those that, if he had not been injured, an injured person would have performed during the first 3 years after the date of the accident, not for income but for the benefit of himself or of his dependent."

cation for replacement services benefits; August 28, 1979, forms requested by Defendant were submitted to Defendant on or about September 3, 1979, Defendant stated that Defendant did not have a document for the purpose of presenting replacement services claim; At the time of said September 3, 1979, statement, the Michigan No Fault Insurance Statute including replacement services benefits had been in effect for almost six years; Plaintiffs created and submitted their own document regarding replacement services on or about November 19, 1979, said application apparently being ignored requiring a follow up letter dated December 13, 1979; On or about January 8, 1980, approximately six months after the accident, Defendant submitted letter apparently denying plaintiff's valid claim; As of date hereof, Defendant has not paid anything at all by way of replacement services benefits.

Before trial, Auto-Owners moved for summary judgment, arguing that mental anguish, exemplary or punitive damages are not available in an action claiming replacement benefits. The motion was denied, as was defendant's subsequent motion for reconsideration, apparently[3] on the ground that plaintiffs' claim for mental anguish, exemplary or punitive damages was based on the tort of intentional infliction of emotional distress rather than in contract. Auto-Owners renewed the motion at trial, this time alleging plaintiffs' failure to properly allege the tort theory in the complaint. The

---

[3] No order denying either the motion for summary judgment or the motion for reconsideration appears in the record on appeal. In denying defendant's renewed motion for summary judgment at trial, the trial judge indicated his reason for denying the earlier motion:

*"The Court:* As you've indicated, counsel, this matter has been considered by the Court previously, and nothing has happened to change my mind. I found then and find again that the tort of intentional infliction of mental distress was well pled and the Plaintiff may proceed with his proofs. Motion for summary judgment is denied."

motion again was denied.[4] At the close of plaintiffs' case, Auto-Owners unsuccessfully moved for a directed verdict, claiming a failure of proof on the same issue. The jury subsequently returned a verdict awarding the plaintiffs a portion of the replacement benefits claimed, as well as $2,500 in mental distress damages. Auto-Owners' motion for a new trial, contesting the validity of the mental distress damage award, also was denied.

In the Court of Appeals, Auto-Owners relied on this Court's then-recent pronouncement in *Kewin v Massachusetts Mutual Life Ins Co,* 409 Mich 401; 295 NW2d 50 (1980), contending that mental distress damages are unavailable in what is essentially a breach of contract action. In affirming the judgment of the lower court, the Court of Appeals distinguished *Kewin* by finding sufficient evidence of tortious conduct—independent of the contract breach—to justify the award of mental distress damages in this case. *Roberts v Auto-Owners Ins Co,* 135 Mich App 595; 354 NW2d 271 (1983).

We granted leave to consider the viability of plaintiffs' tort theory on the facts of this case, and directed the parties to brief the issues set forth above.

II

In *Kewin, supra,* we held that a disability insurance policy did not involve matters of mental concern and solicitude that would justify an award of mental distress damages for its breach.[5] 409 Mich 416. We further held that exemplary damages are not recoverable for breach of a commer-

---

[4] See n 3.

[5] Recovery of mental distress damages for breach of contract is nevertheless permissible if such damages can "reasonably be said to have been in contemplation of the parties at the time the contract was made." *Kewin, supra,* 409 Mich 419.

cial contract "absent allegation and proof of tortious conduct existing independent of the breach." 409 Mich 420-421; see also *Valentine v General American Credit, Inc,* 420 Mich 256, 263; 362 NW2d 628 (1984). Left open, however, was the question raised in this appeal: whether a separate tort claim for intentional infliction of emotional distress can be brought on the basis of an insurer's dilatory conduct in handling an insured's claim.[6]

The tort theory forwarded by plaintiffs has been recognized elsewhere to permit recovery of mental distress damages separate and apart from the recovery of contractual damages for breach of an insurance policy. See, *e.g., Eckenrode v Life of America Ins Co,* 470 F2d 1 (CA 7, 1972); *Strader v Union Hall, Inc,* 486 F Supp 159 (ND Ill, 1980); *Amsden v Grinnell Mutual Reinsurance Co,* 203 NW2d 252 (Iowa, 1972); *Fletcher v Western National Life Ins Co,* 10 Cal App 3d 376; 89 Cal Rptr 78; 47 ALR3d 286 (1970); see, generally, Holmes, *Is there life after Gilmore's death of contract?—Inductions from a study of commercial good faith in first-party insurance contracts,* 65 Cornell L R 330, 356-359 (1980). Indeed, although the instant case apparently marks the first appellate affirmance of a mental distress award in this context, our Court of Appeals has previously acknowledged (at least implicitly) the viability of the intentional infliction theory in insurance suits alleging dilatory handling of claims. See *Butt v DAIIE,* 129 Mich App 211, 218-219; 341 NW2d 474 (1983); *Butler v DAIIE,* 121 Mich App 727, 735-737; 329 NW2d 781 (1982); *Holmes v Allstate Ins Co,* 119 Mich App 710, 713-718; 326 NW2d 616 (1982) (workers' compensation action); *Frishett v State Farm Mutual*

---

[6] See *Kewin, supra,* 409 Mich 421. ("We express no opinion on the accuracy of the Court of Appeals observation that Michigan recognizes a tort action for the intentional infliction of mental distress.")

*Automobile Ins Co,* 3 Mich App 688; 143 NW2d 612 (1966); see also *Bolden v John Hancock Mutual Life Ins Co,* 422 F Supp 28, 29-31 (ED Mich, 1976).

Those courts which have recognized intentional infliction of emotional distress as a separate theory of recovery have generally embraced the Restatement definition of the tort:

> § 46. Outrageous Conduct Causing Severe Emotional Distress
>
> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. [Restatement Torts, 2d, § 46, p 71.]

Four elements are identified in this definition: (1) "extreme and outrageous" conduct, (2) intent or recklessness, (3) causation, and (4) "severe emotional distress." See, *e.g., Ross v Burns,* 612 F2d 271, 273 (CA 6, 1980).

We find that plaintiffs herein failed to make the minimum showing of proof of either "extreme and outrageous" conduct or "severe emotional distress" required to withstand defendant's motion for a directed verdict.

A. *Extreme and Outrageous Conduct*

An oft-quoted Restatement comment summarizes the prevailing view of what constitutes "extreme and outrageous" conduct:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his con-

duct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. [Restatement Torts, 2d, § 46, comment d, pp 72-73.]

Another Restatement comment further qualifies the conduct proscribed by this tort:

The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress. [Restatement Torts, 2d, § 46, comment g, p 76.]

Further, in a contractual setting, a tort action must rest on a breach of duty distinct from con-

tract. Thus, in *Hart v Ludwig,* 347 Mich 559; 79 NW2d 895 (1956), we recognized that mere *nonfeasance* of a contractual obligation cannot give rise to a negligence cause of action in tort:[7]

> The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise. Otherwise, the failure to meet a note, or any other promise to pay money, would sustain an action in tort for negligence, and thus the promisor be made liable for all the consequential damages arising from such failure.
>
> *As a general rule, there must be some active negligence or misfeasance to support tort. There must be some breach of duty distinct from breach of contract.* In the case at bar, the utmost shown against the defendant is that there was unreasonable delay on its part in performing an executory contract. [347 Mich 563 (quoting from *Tuttle v Gilbert Mfg Co,* 145 Mass 169, 174-175; 13 NE 465 [1887]). Emphasis added.]

Moreover, in *Kewin, supra,* we declined to recognize a separate cause of action for bad-faith breach of an insurance contract, although some of our sister states have chosen to do so. 409 Mich 423.[8]

---

[7] See also Holmes article, *supra,* p 359. ("Apparently, no court has found outrageous conduct without affirmative conduct. Thus, a mere denial of liability or refusal to pay, even though unreasonable and in bad faith, is not deemed outrageous.")

[8] The receptiveness of our sister state courts to the tort of bad-faith breach of an insurance contract has been mixed. Compare *Noble v National American Life Ins Co,* 128 Ariz 188; 624 P2d 866 (1981) (tort recognized); *Bibeault v Hanover Ins Co,* 417 A2d 313 (RI, 1980) (tort recognized), with *D'Ambrosio v Pennsylvania National Mutual Casualty Ins Co,* 494 Pa 501; 431 A2d 966 (1981) (tort rejected); *Spencer v Aetna Life & Casualty Ins Co,* 227 Kan 914; 611 P2d 149 (1980) (tort rejected); *Lawton v Great Southwest Fire Ins Co,* 118 NH 607; 392 A2d 576 (1978) (tort rejected). The adequacy of existing legislative remedies has been a primary factor in refusing to recognize the bad-faith tort. See *D'Ambrosio, supra; Spencer, supra; Lawton, supra.*

We express no opinion at this time whether existing legislative remedies should similarly preclude recognition of the tort of intentional infliction of emotional distress in the insurance context.

The foregoing principles do not preclude recovery for an insurer's intentional infliction of emotional distress. However, our continued adherence to these precepts, combined with the observations noted in the Restatement comments, significantly limits the range of circumstances in which a prima facie showing of outrageousness can be made in the insurance context. The mere failure to pay a contractual obligation, without more, will not amount to outrageous conduct for purposes of this tort. See *Bolden, supra,* 422 F Supp 31 (defendant's summary judgment motion granted where plaintiff's claim "does not arise out of any conduct by the insurer other than not paying his claim"); *Valentine v General American Credit, Inc,* 123 Mich App 521, 527; 332 NW2d 591 (1983) (pleading insufficient where only intentional breach alleged), *aff'd* 420 Mich 256; 362 NW2d 628 (1984); *Van Marter v American Fidelity Fire Ins Co,* 114 Mich App 171, 185; 318 NW2d 679 (1982). In addition, an insurer's request for verification of claims, in the absence of evidence of harassment or similarly egregious conduct, falls short of conduct which we would consider "tortiously outrageous." See *Butt v DAIIE,* 129 Mich App 211; 341 NW2d 474 (1983); *Holmes v Allstate Ins Co,* 119 Mich App 710; 326 NW2d 616 (1982).

The instant plaintiffs rely on the following facts as establishing Auto-Owners' "extreme and outrageous" conduct: (1) Auto-Owners' failure to supply plaintiffs with a form for claiming replacement services benefits, even though the statutory no-fault provision relating thereto had been in effect for six years; (2) Auto-Owners' delay in responding to the claim for replacement services (roughly six months after the accident, and two months after plaintiffs created and submitted their own document claiming replacement benefits); (3) Auto-

Owners' apparent denial of the replacement bene-
fits claim.[9] Recognizing that tortious conduct apart

---

[9] Auto-Owners' "denial" of the replacement services claim actually
took the form of a request for further verification:

*Letter of January 8, 1980*

"Bush, Luce, Henderson & Bankson          "Jan. 8, 1980
Attorneys at Law
412 Mich. Nat. Bank Bldg.
Port Huron, Mi. 48060

                                        "RE: Our insureds Ralph and
                                             Doloris [*sic*] Roberts
                                             Claim X7-6004-79
                                             Yours-Christine Rodzos

"ATTN: S. Keith Bankson

"Dear Mr. Bankson:

"This is to acknowledge receipt of your letters of November 19, 1979
and December 13, 1979.

"Under 'Description of Services' in your affidavit, we would consider
only two [*sic*] and from the doctor and would need mileage verification
in support. Under the medical portion of the No-Fault law, we would
consider the other items under "Description of Services" in the
affidavit only if verified by the doctor. These listed items do not come
under the work loss portion of the No-Fault law (see Section #3107,
part b). They come under Section #3107 part a.

                                        "Very truly yours,
                                        "District Claim Office

                                        "E.H. Selden
                                        "Claim Representative"

Although the letter is not a model of clarity, inasmuch as the claim
for replacement services (under MCL 500.3107[b]; MSA 24.13107[b])
was treated by Auto-Owners as a claim for expenses (under MCL
500.3107[a]; MSA 24.13107[a]), the letter may reasonably be construed
as a denial of the replacement services claim as submitted.
  After plaintiffs received the foregoing letter, there was no further
communication with Auto-Owners until this suit was instituted
shortly thereafter. Thus, this was unlike the situation where an
insurer through ongoing exchanges with the insured has knowledge of
the necessity for payment, but adamantly and in bad faith denies
liability—facts on which a claim of outrageous conduct might be
based. See *Eckenrode, supra.*

from breach of the insurance contract is required to make out a claim for intentional infliction of emotional distress, the Court of Appeals nevertheless found that plaintiffs had supplied sufficient evidence of "extreme and outrageous" conduct to justify sending the claim to the jury:

> This case involves significantly more than the mere failure to pay benefits. Plaintiffs' case is based upon allegations of defendant's intentional attempts to frustrate them from applying for benefits. Plaintiffs allege that defendant was informed of the nature and extent of Christine's injuries and the costs of the services incurred therefrom but only supplied an application for a small portion of the payable benefits. Defendant claims that six years after the enactment of the no-fault statute it did not have application forms for the benefits plaintiffs requested under the act. This forced plaintiffs to procure counsel to apply for no-fault benefits. Considering the fact that defendant was informed that Christine had a severe facial scar that might necessitate plastic surgery, its conduct in frustrating plaintiffs' attempts to apply for benefits and define the limits of the policy could properly be considered as extreme and outrageous by a jury. [135 Mich App 598-599.]

We disagree with this assessment of the evidence. While Auto-Owners' conduct is hardly praiseworthy, plaintiffs alleged no more than the failure by Auto-Owners to facilitate the filing of a replacement services claim, a delay of at most six months in responding to the claim as filed, and the denial of benefits owed. Such conduct may properly be considered unreasonable for purposes of assessing the statutory penalty for overdue payments as well as plaintiffs' attorney fees against

Auto-Owners.[10] However, the record evidence falls "far short of the conduct which is considered tortiously outrageous." *Butt, supra,* p 219. There is no indication that Auto-Owners set out to harass these plaintiffs, nor does the evidence disclose a course of conduct that may fairly be characterized as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," Restatement Torts, 2d, § 46, comment d, p 73. At most, the dilatory handling of plaintiffs' claim constitutes "bad faith" justifying imposition of the statutory penalties set forth above, but for which this Court has held no separate cause of action can lie. See *Kewin, supra,* 409 Mich 423.

## B. *Severe Emotional Distress*

The Restatement commentary explains the emotional distress requirement as follows:

> The rule stated in this Section applies only where the emotional distress has in fact resulted, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. *It is only where it is extreme that the liability arises.* Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted is so severe that no reasonable*

---

[10] In fact, penalties of $57.96 in interest for overdue payment (under MCL 500.3142[3]; MSA 24.13142[3]) and $5,880 in attorney fees (under MCL 500.3148[1]; MSA 24.13148[1]) were assessed against Auto-Owners in the judgment.

*man could be expected to endure it.* [Restatement Torts, 2d, § 46, comment j, p 77. Emphasis added.]

Further, although bodily injury need not result, the Restatement commentary suggests that "more in the way of outrage" may be required where a claim is based on emotional injury alone. *Id.,* comment k, p 78.

Plaintiffs' evidence of severe emotional distress consisted entirely of the following testimony by Ralph and Delores Roberts:

*Ralph Roberts—Direct Examination*

> *Q.* Have you ever been paid one nickel of this?
> *A.* Not of the—on that paper there.
> *Q.* How does that make you feel? How has that made you feel?
> *A.* Well, it make me kind of disappointed or mad.
> *Q.* Get upset about that?
> *A.* Yes.
> *Q.* Why?
> *A.* Well, they took my payments and that for the insurance.

\* \* \*

> *Q.* How have you felt ever since this accident happened to today? Let me say April '79, two and a half years ago, have they paid anything yet?
> *A.* Just this one bill—two bills, the doctor and the ambulance.
> *Q.* Why does it make you mad?
> *A.* (No response.)
> *Q.* Does it make you mad, really?
> *A.* Yes.
> *Q.* Why?
> *A.* Makes me mad, like I said, because they take my money for the payments and I think they should pay off their part.
> *Q.* You haven't had to go to the hospital, Ralph, over being upset about this, have you?

*A.* No.

*Q.* Nobody is claiming that they are having any kind of breakdown or anything of that nature, are they?

*A.* No.

*Q.* You are upset and concerned and angry about it, aren't you?

*A.* Yes.

*Q.* And you have been since they refused to pay in the summer of '79, for over two years now; is that right?

*A.* Yes.

### Delores Roberts—Direct Examination

*Q.* And Ralph has testified you haven't been paid any replacement services; is that correct?

*A.* That's correct.

*Q.* How does that make you feel?

*A.* It makes me feel mad.

*Q.* Why?

*A.* Because, I figure if we pay the insurance company they should at least stand behind their policy.

*Q.* How long have you felt this way?

*A.* I felt this way ever since she's been injured in this accident and it was reported to Churchill's.

*Q.* Would you say, Mrs. Roberts, not to belabor that point, this simply emotionally distresses you?

*A.* Yes, it does.

*Q.* And you've never had to go to the doctor or anything like that, have you?

*A.* No, sir.

Although anger may be an indicia of emotional distress, the reaction testified to does not even approach the level of emotional distress contemplated by the Restatement drafters in requiring that "no reasonable man could be expected to endure it." Rather, plaintiffs' anger is more consis-

tent with that which normally accompanies the breach of a contractual obligation. There was no evidence of grief, depression, disruption of life style, or of treatment for anxiety or depression. The distress proved by plaintiffs was, as a matter of law, insufficient to support this cause of action.

## III

Judging from the seventy-six pages of annotations that currently accompany § 46 of the Second Restatement of Torts, it is clear that the tort of intentional infliction of emotional distress has gained widespread acceptance, in a variety of factual contexts, in the courts of our sister states. Because we find that plaintiffs' proofs failed even to make out a prima facie claim for relief under the Restatement definition, our review both of the policy implications for adopting this tort in general and of the propriety of allowing such recovery in the insurance context must await a case in which those concerns are necessarily presented.

We reverse the judgment of the Court of Appeals and modify the judgment of the trial court by vacating the award of mental distress damages.

RYAN, BRICKLEY, CAVANAGH, and RILEY, JJ., concurred with BOYLE, J.

WILLIAMS, C.J. (*concurring*). I concur in the result on these facts, but would have this Court join the growing trend in the courts of our sister states recognizing the tort of intentional infliction of emotional distress as exemplified by § 46 of the Restatement Torts, 2d.

LEVIN, J. (*separate opinion*). I agree with the signers of the opinion of the Court that the plaintiffs failed to meet the threshold requirements of

proof to make out a prima facie claim of intentional infliction of emotional distress.

Although the Court draws back from "formally adopt[ing]" the tort of intentional infliction of emotional distress into this state's jurisprudence, recognizing that the question whether it should be adopted need not be decided on these facts, it intimates that the Court is prepared to look favorably on this "modern tort."[1] This focus on the potential development of a tort action to compensate a plaintiff complaining of dilatory and bad-faith tactics of an insurance company impels me to write separately and to reiterate views previously expressed on the underlying issue in this case, namely, unjustified civil litigation.

The civil justice system is beleaguered with unjustified litigation from both the plaintiff and defendant sides of a lawsuit—nuisance actions commenced by some plaintiffs and stonewall tactics by some insurers and other defendants.

As the judicial body that has the ultimate responsibility to address the problems in the judicial system that make delay, harassment, and unnecessary litigation effective tactics for both an insured and an insurer, we should question whether recognition of still another cause of action—that would increase the burden of litigation and randomly provide a fortuitous amount of compensation in a handful of isolated cases, *Friedman v Dozorc,* 412 Mich 1, 57; 312 NW2d 585 (1981) (opinion of Levin, J.)—is the most efficacious means of addressing the problems which continue to beset us.

I am of the opinion that this Court should

---

[1] The majority states that "we are *constrained* from reaching the issue as to whether this *modern tort* should be formally adopted into our jurisprudence" (emphasis added) and later suggests that although limited, there is a range of circumstances in which a prima facie showing of outrageousness can be made in the insurance context.

enlarge MCR 2.114(D), (E) to provide compensation
for *all* pecuniary loss resulting from unjustified
litigation. Both the bench and bar should be put
on notice that trial judges are expected to enforce
this rule and that litigants who can show that it
has not been enforced can obtain relief in the
appellate courts.

I

The actual holding in this case, that the Roberts
failed to meet the threshold requirements of proof
to make out a prima facie claim of intentional
infliction of emotional distress, is well supported in
the cases. There appears to be general agreement,
as expressed in the opinion of the Court, that the
"mere failure to pay a contractual obligation,
without more, will not amount to outrageous
conduct . . . ."[2]

---

[2] The courts of Alabama, Arizona, Florida, Illinois, Iowa, Minnesota,
New York, and the District of Columbia have declined to recognize a
cause of action in tort for emotional distress when the gravamen of
the complaint was the insurer's delay or refusal to pay.

The Alabama Supreme Court, in *Vincent v Blue Cross-Blue Shield
of Alabama, Inc,* 373 So 2d 1054 (Ala, 1979), found the evidence
insufficient to support the claim of the insureds for intentional
infliction of emotional distress resulting from the insurer's initial
disallowance of claims under a preexisting condition exclusion and
rude treatment of the insureds. But see also *National Security Fire &
Casualty Co v Bowen,* 447 So 2d 133 (Ala, 1983), n 21 *infra,* where the
insured recovered damages on more egregious facts.

In *Davis v First National Bank of Arizona,* 124 Ariz App 458; 605
P2d 37 (1979), the Arizona intermediate appellate court concluded
that a bank and insurer were not liable for emotional distress alleged
to have resulted from attempts to rescind a loan contract, delays in
payment of disability benefits, and attempts to restrict coverage of
disability benefits.

The Florida Supreme Court quashed the decision of the district
court holding that a deceased had a civil action for intentional
infliction of emotional distress sufficient to support an action for
wrongful death, where the insurance company demanded proof of
eligibility and withheld payments of benefits, even though lack of
money forced the removal of deceased to a nursing home, the stress of
which probably contributed to her death. *Metropolitan Life Ins Co v
McCarson,* 467 So 2d 277 (Fla, 1985).

The critical question—not presented, to be sure, by the facts of this case—is whether a cause of action may be maintained on evidence that an insurer engaged in unfair claim-settlement practices, such as refusing to pay a claim without conducting a reasonable investigation,[3] interposing

---

In *Robertson v Travelers Ins Co*, 95 Ill 2d 441; 448 NE2d 866 (1983), the Illinois Supreme Court held that vexatious delay alone will not support an action for the tort of outrage. And in *Tobolt v Allstate Ins Co*, 75 Ill App 3d 57; 393 NE2d 1171 (1979), an insurer's refusal to pay proceeds under a homeowner's policy was not outrageous conduct even though the insureds were rendered indigent as a result of the fire loss and were unable to provide the necessities of life for themselves and their son.

An insurer's failure immediately to pay on a fire insurance policy did not even "begin to approach outrageous conduct" where the delay was due to an arson investigation in the Iowa Supreme Court case of *Amsden v Grinnell Mutual Reinsurance Co*, 203 NW2d 252, 255 (Iowa, 1972).

The Minnesota Supreme Court, in *Haagenson v National Farmers Union Property & Casualty Co*, 277 NW2d 648, 652 (Minn, 1979), held, notwithstanding the jury's finding that an insurer's conduct in delaying payment of no-fault benefits was "intentional, malicious and in bad faith," that emotional and punitive damages were not recoverable for bad-faith breach of contract and stated that a malicious motive did not convert a contract action into a tort action.

In the New York case of *Riffat v Continental Ins Co*, 104 AD2d 301; 478 NYS2d 635 (1984), the intermediate appellate court concluded that an insurer's refusal to pay accidental dismemberment benefits did not state a cause of action in tort; the remedy was an action for breach of contract. Accord *Bruno v Home Mutual Ins Co of Binghamton*, 91 AD2d 1169; 459 NYS2d 136 (1983); *Manolis v International Life Ins Co of Buffalo*, 83 AD2d 784; 443 NYS2d 461 (1981).

In *Sere v Group Hospitalization, Inc*, 443 A2d 33 (DC App, 1982), cert den 459 US 912 (1982), the court concluded that a directed verdict on the issue of "extreme and outrageous conduct" was proper where the insurer failed to pay because the request for additional information from insured was not honored.

[3] See *Strader v Union Hall, Inc*, 486 F Supp 159 (ND Ill, 1980), where the court declined to dismiss by summary judgment a claim based on an insurance company's failure to investigate the merits of the claim and alleged misrepresentation of the nature of coverage, stating that this constituted the type of abusive behavior that gives rise to the tort of intentional infliction of emotional harm. Contrast *Sigler v Mutual Benefit Life Ins Co*, 506 F Supp 542 (SD Iowa, 1981), aff'd 663 F2d 49 (CA 8, 1981), where an insured's contentions that an insurance company acted maliciously by failing to investigate a claim for accidental death benefits and by forcing the plaintiff to initiate legal action, thereby exposing her to public embarrassment because of

a defense not well grounded in fact to harass or to cause unnecessary delay,[4] and compelling an insured to institute litigation to recover or refusing to pay amounts due under an insurance policy by offering inadequate amounts.[5]

All would agree that unfair claim-settlement practices are contrary to public policy, some might say "outrageous." While this Court does not recognize a cause of action on the facts of the present case, it indicates that in a limited range of circumstances a prima facie showing of outrageous conduct can be made in the insurance context. This suggestion of a cause of action for "intentional and outrageous conduct" is made without boundaries or guidelines for the bench or bar. Nor are the boundaries properly spelled out by references to the Restatement Torts, 2d, § 46, the accompanying commentary, or to "seventy-six pages of annotations that currently accompany § 46 . . . ."

The twenty-two illustrations in the commentary accompanying the blackletter of the Restatement Torts, 2d, § 46, are based on the cases that had

her husband's death from an autoerotic experience, were found not to be supported by the evidence and summary judgment was granted.

[4] In *Eckenrode v Life of America Ins Co,* 470 F2d 1 (CA 7, 1972) (applying Illinois law), a cause of action for severe emotional injury was stated where an insurer "invited" compromise of a claim by falsely implying it had a valid defense to payment—a police investigation—in the face of a clear duty to pay. *Cf. Othman v Globe Indemnity Co,* 759 F2d 1458 (CA 9, 1985) (applying California law), where the court concluded that the evidence did not support a cause of action for "outrageous conduct," but the insurer's unreasonable actions before denying reconsideration of the claim—in handling the claim with intent to entice the insured to lose his rights through the application of the statute of limitations—would raise a question for the jury of bad faith under *Gruenberg v Aetna Ins Co,* 9 Cal 3d 566; 108 Cal Rptr 480; 510 P2d 1032 (1973).

[5] See *Sigler v Mutual Benefit Life Ins Co,* n 3 *supra.* In *Debolt v Mutual of Omaha,* 56 Ill App 3d 111; 371 NE2d 373 (1978), the insurer delayed and ultimately ceased payment of disability income forcing the plaintiff to employ counsel and file a lawsuit. The appellate court held that the plaintiff failed to state a cause of action for intentional infliction of emotional distress.

then been decided. A review of the illustrations indicates that, for the most part, they are far afield from the present case. Liability was found where there were threats of physical injury to the plaintiff or a relative,[6] there were threats of destruction of property or of a relationship with the plaintiff's employer,[7] false reports of injury to a relative were knowingly made,[8] there were threats of or actual false arrest or imprisonment,[9] and

---

[6] See Illustration Number 2:

"A, the president of an association of rubbish collectors, summons B to a meeting of the association, and in the presence of an intimidating group of associates tells B that B has been collecting rubbish in territory which the association regards as exclusively allocated to one of its members. A demands that B pay over the proceeds of his rubbish collection, and tells B that if he does not do so the association will beat him up, destroy his truck, and put him out of business. B is badly frightened, and suffers severe emotional distress. A is subject to liability to B for his emotional distress, and if it results in illness, A is also subject to liability to B for his illness."

[7] See Illustration Number 7:

"A, a creditor, seeking to collect a debt from B, sends B a series of letters in lurid envelopes bearing a picture of lightning about to strike, in which A repeatedly threatens suit without bringing it, reviles B as a deadbeat, a dishonest man, and a criminal, and threatens to garnish his wages, to bother his employer so much that B will be discharged, and to "tie B up tight as a drum" if he does not pay. B suffers severe emotional distress. A is subject to liability to B."

[8] See Illustration Number 1:

"As a practical joke, A falsely tells B that her husband has been badly injured in an accident, and is in the hospital with both legs broken. B suffers severe emotional distress. A is subject to liability to B for her emotional distress. If it causes nervous shock and resulting illness, A is subject to liability to B for her illness."

[9] See Illustration Number 5:

"A, a private detective, calls on B and represents himself to be a police officer. He threatens to arrest B on a charge of espionage unless B surrenders letters of a third person which are in her possession. B suffers severe emotional distress and resulting illness. A is subject to liability to B for both."

and see Illustration Number 6:

"A, the principal of a high school, summons B, a schoolgirl, to his office, and abruptly accuses her of immoral conduct with various men. A bullies B for an hour, and threatens her with prison and with public disgrace for herself and her parents unless she confesses. B suffers severe emotional distress, and resulting illness. A is subject to liability to B for both."

public humiliation occurred[10]—such as where a
woman was provided with a bathing suit that
would dissolve in water in the presence of a group
of men and women. The only illustration based on
abusive behavior of an insurance adjuster supposes
that an adjuster enters a hospital room for the
purpose of settling an insurance claim and, know-
ing of the plaintiff's weakened condition, acts in a
boisterous and rude manner causing severe emo-
tional distress and a heart attack.[11]

---

[10] See Illustration Number 3:

"A is invited to a swimming party at an exclusive resort. B gives
her a bathing suit which he knows will dissolve in water. It does
dissolve while she is swimming, leaving her naked in the presence of
men and women whom she has just met. A suffers extreme embar-
rassment, shame, and humiliation. B is subject to liability to A for
her emotional distress."

"A, an eccentric and mentally deficient old maid, has the delusion
that a pot of gold is buried in her back yard, and is always digging for
it. Knowing this, B buries a pot with other contents in her yard, and
when A digs it up causes her to be escorted in triumph to the city
hall, where the pot is opened under circumstances of public humilia-
tion to A. A suffers severe emotional disturbance and resulting
illness. B is subject to liability for both."

[11] The illustrations in the commentary to the Restatement Torts,
2d, § 46, are for the most part not based on insurance cases. The two
exceptions are Illustrations Nos. 7 and 12, which indicate that ex-
treme and outrageous conduct may be found on the basis of an abuse
of a position which gives the actor authority or power over the other
(comment e) or on the basis of the actor's knowledge that the other is
peculiarly susceptible to emotional distress (comment f).

The reporter's notes to Illustration No. 7—the bullying tactics of
creditors—cites the analogous behavior of insurance adjusters in two
Oklahoma and one Mississippi case. In *National Life & Accident Ins
Co v Anderson,* 187 Okla 180; 102 P2d 141 (1940), an insurance
agent's behavior at an insured's home—berating her in uncomplimen-
tary language, and charging that she was not sick—caused physical
injury as a result of mental shock and was sufficient to defeat a
motion for directed verdict. The judgment for the plaintiff, however,
was reversed, and the cause was remanded for a new trial because of
erroneous jury instructions. Accord *Pacific Mutual Life Ins Co of
California v Tetirick,* 185 Okla 37; 89 P2d 774 (1938). In *Continental
Casualty Co v Garnett,* 173 Miss 676; 161 So 753 (1935), a jury verdict
for wilful and wanton conduct was affirmed where an insurance agent
went to the home of an insured and denied a claim for compensation
under a health policy and used insulting and abusive language in
charging that the insured was presenting a false and fraudulent
claim.

The author of the commentary accompanying the Restatement Torts, 2d, § 46, recognizes that callousness and heartlessness, even if it causes dire consequences and emotional distress, does not alone subject the actor to tort liability for emotional distress. In one of the twenty-two illustrations, a landlord evicts a woman and her children who are destitute and ill. The commentary states that while such conduct is heartless, the landlord has done no more than the law permits him to do.[12] Insistence upon legal rights in a permissible way, even though the actor is aware that such insistence is certain to cause emotional distress, does not subject him to liability.

Surely this Court has not, and cannot properly, adopt either the blackletter or the commentary accompanying § 46 or the seventy-six pages of annotations.[13] The application of the concepts, expressed in § 46 and discussed in the accompanying

Illustration No. 12 is drawn largely from the Georgia case of *Interstate Life & Accident Co v Brewer,* 56 Ga App 599; 193 SE 458 (1937). There the plaintiff recovered damages where an insurance representative, with knowledge of an insured's physical condition, went to her sick room and persisted in forcing a settlement upon her by throwing a handful of coins in her face and yelling that "[y]ou don't need a doctor; you ought to die . . . ."

[12] Illustration No. 14.

[13] In *Smith v Allendale Mutual Ins Co,* 410 Mich 685, 712-713; 303 NW2d 702 (1981), this Court said

"that the application of a common-law rule to a particular set of facts does not turn upon whether those facts can be characterized in the language of the Restatement section corresponding to the common-law rule. Unlike a statute, which expresses a legislative directive for the treatment of future cases, the Restatement seeks primarily to distill the teachings of decided cases and is descriptive. While its drafters may sometimes strive to choose 'the better rule' or to predict or shape the development of the law, its influence depends upon its persuasiveness. Even where a particular Restatement section has received specific judicial endorsement, cases where that section is invoked must be decided by reference to the policies and precedents underlying the rule restated. Textual analysis of the Restatement is useful only to the extent that it illuminates these fundamental considerations."

commentary, in concrete cases is a matter on which courts disagree. Only by deciding specific cases can this Court give meaning to the words "intentional and outrageous conduct" and indicate to what extent it agrees with the commentary accompanying § 46 and the terminology of § 46 itself.

One might rationalize that unfair claim-settlement practices can have consequences that to some people are as serious as those that might result from abusive language and threats of physical injury or the other conduct described in the twenty-two illustrations in the commentary accompanying the Restatement. But the argument can also be made that the recognition of a tort in the cases described in the twenty-two illustrations does not justify an extension of whatever principle may have been developed in those circumstances to refusals to pay money, however wilful and unjustified. The law frequently finds it necessary to draw lines lest a principle developed in one context be run into the ground in another.

> Decisions delineating the extent of tort liability are . . . more than exercises in logic. They are pronouncements of social policy which should reflect the often subtle balance of the interests involved. The Supreme Court of New Jersey observed:
>
> "[L]ogic (and even abstract justice) must defer to overall policy in the appraisal of the justification for judicial changes in the common law." [*Russell v Salem Transportation Co*, 61 NJ 502, 506; 295 A2d 862 (1972).]
>
> \*   \*   \*
>
> [I]t is not enough to invoke analogies. An independent re-examination of the policy considerations implicated by the creation of such a separate cause of action is called for. [*Berger v Weber*, 411

Mich 1, 23-24; 303 NW2d 424 (1981) (LEVIN, J.,
*dissenting*).]

## II

This Court declared in *Kewin v Massachusetts
Mutual Life Ins Co,* 409 Mich 401, 423; 295 NW2d
50 (1980) that, "absent allegation and proof of
tortious conduct independent of the breach," exem-
plary damages are not recoverable for breach of a
commercial contract. In so declaring, this Court
declined to follow a decision of the California
Supreme Court "and to declare the mere bad-faith
breach of an insurance indemnity contract an
independent and separately actionable tort and to
thereby open the door to recovery for mental pain
and suffering caused by breach of a commercial
contract."[14] *Kewin* reserved the question whether a
tort action can be maintained for the intentional
infliction of emotional distress.

It makes little difference to the insured or an
insurer whether mental distress damages are al-
lowed as contract or tort damages. Changing the
form of action to one labeled in tort does not, in
the same factual context, justify a rule of damages
different from that stated in *Kewin* and *Valentine
v General American Credit, Inc,* 420 Mich 256; 362
NW2d 628 (1984). In *Valentine,* this Court de-
clared that mental distress damages were not
recoverable in an action for breach of an employ-
ment contract although the denial of such dam-
ages would leave the plaintiff with less than full
recovery. We said that the law does not seek to
compensate for all losses suffered.

[14] *Cf. Gruenberg v Aetna Ins Co,* 9 Cal 3d 566; 108 Cal Rptr 480;
510 P2d 1032 (1973), in which the California Supreme Court devel-
oped a tort cause of action for bad-faith breach of an insurance
contract.

Recovery is denied for attorney's fees, for mental anguish not accompanied by physical manifestation, and "make-whole" or full recovery has been denied where the cost of performance exceeds the value to the promisee. The courts have not, despite "make whole" generalizations regarding the damages recoverable, attempted to provide compensation for all losses. [420 Mich 261.]

The key question is under what circumstances—not under what label—mental distress damages are collectible.

### III

The opinion of the Court cites four decisions standing for the proposition that the tort theory of intentional infliction of emotional distress has been recognized to permit recovery of mental distress damages separate from the recovery of contractual damages for breach of an insurance policy. Both *Eckenrode v Life of America Ins Co*, 470 F2d 1 (CA 7, 1972), and *Strader v Union Hall, Inc*, 486 F Supp 159 (ND Ill, 1980), are federal cases purporting to apply Illinois law.[15] In light of subsequent Illinois decisions, it is questionable whether they would be so decided today.[16]

Subsequent to *Eckenrode* and *Strader*, the Illi-

---

[15] In the absence of a settled question of state law, a federal court will make an educated "guess" of what the highest court of the state would conclude if faced with the same question. But the conclusion of the federal court, even several like holdings, does not constitute state law.

[16] The Illinois appellate courts have consistently rejected claims alleging "outrageous" conduct in the handling of insurance claims. In *McCall v Health Care Service Corp*, 117 Ill App 3d 107; 452 NE2d 893 (1983), the court said that delays in paying hospitalization benefits and failure to provide the plaintiff with accurate information regarding the status of her claim, which resulted in an action by a hospital against an insured and garnishment of her wages, was not conduct so "outrageous or severe" as to amount to intentional infliction of emotional distress. See also *Tobolt v Allstate Ins Co*, n 2 *supra*, and *Debolt v Mutual of Omaha*, n 5 *supra*.

nois Supreme Court left open the question whether a plaintiff may claim in tort for emotional distress resulting from "outrageous" activity apart from delay and held that vexatious delay in and of itself will not support an action for the tort of outrage. *Robertson v Travelers Ins Co,* 95 Ill 2d 441; 448 NE2d 866 (1983). Before *Robertson,* Illinois intermediate appellate courts similarly held that such an action cannot be maintained, relying, in part, on a legislative provision similar to a provision in Michigan law allowing for the recovery of attorney fees as a remedy for an insurer's unreasonable delay.[17] A United States district court in Illinois has, in light of the legislative provision for taxing costs if an insurer unreasonably delays in settling a claim, read *Robertson* as precluding a cause of action for the intentional infliction of emotional distress resulting from an insurer's outrageous delay in settling a claim.[18]

The third case cited in the majority opinion is *Amsden v Grinnell Mutual Reinsurance Co,* 203 NW2d 252 (Iowa, 1972), where the Iowa Supreme Court "recognized" the tort of intentional infliction of emotional distress, but went on to hold that the conduct in the case then before the Court did not even begin to approach "outrage." In the only

[17] See *Tobolt v Allstate Ins Co,* n 2 *supra,* and *Debolt v Mutual of Omaha,* n 5 *supra.*

The Illinois courts distinguish the California cases such as *Fletcher v Western National Life Ins,* 10 Cal App 3d 376; 89 Cal Rptr 78 (1970), on which plaintiffs relied for the theory of intentional infliction of emotional distress, on the basis that California did not have a statutory provision analogous to the Illinois provision which permits an insured to recoup additional costs (*e.g.,* attorney fees) where an insurer's refusal to pay has been vexatious and unreasonable. *Tobolt v Allstate Ins Co,* 75 Ill App 3d 71.

[18] See *Anderson v Mutual of Omaha Ins Co,* 594 F Supp 726 (SD Ill, 1984). *Robertson,* in declining to allow recovery in tort for emotional distress, relied on a similar remedial provision for vexatious or frivolous delay in the payment of workers' compensation benefits.

The analogous Michigan legislative provision is discussed in n 27.

subsequent Iowa case, the court said there was insufficient evidence of emotional distress.[19]

*Fletcher v Western National Life Ins,* 10 Cal App 3d 376; 89 Cal Rptr 78 (1970), the fourth case cited, does indeed recognize this theory of recovery.[20] *Fletcher* has been followed in other jurisdictions where the conduct included verbal assaults or threats of criminal prosecution, and it has been followed as well in other cases where the behavior

[19] *Amsden v Grinnell Mutual Reinsurance Co,* n 2 *supra.* The plaintiffs, in *Higgins v Blue Cross of Western Iowa & South Dakota,* 319 NW2d 232 (Iowa, 1982), did not challenge on appeal the trial court's ruling of insufficient evidence of emotional distress where an insurance company had rescinded a contract for hospital services because of a failure to disclose a preexisting condition.

[20] *Fletcher* is regarded as the landmark first-party case holding that an insurer's bad-faith refusal to make payments under a disability policy gives rise to a cause of action for intentional infliction of emotional distress. There the insurer discontinued disability payments by seizing on (and misinterpreting) certain medical statements to conclude that Fletcher was suffering from a condition which he may have contracted from a horse (and therefore could only be paid under the more limited provision for sickness payments), and later by contending that Fletcher's condition was congenital rather than a result of recent injury. No investigation was undertaken regarding this congenital defect. The company then "embarked upon a concerted course of conduct" to persuade Fletcher to surrender his policy or otherwise enter into a disadvantageous settlement through economic coercion (he was disabled and destitute). The insurance company conceded that its behavior was "outrageous," but claimed that it was privileged because it was engaged in settlement negotiations and there was no evidence of severe emotional distress.

The California court allowed recovery in tort on two theories: (1) intentional infliction of emotional distress and (2) "tortious interference with a property interest of its insured"—later to become bad-faith breach of contract sounding in tort.

The California Supreme Court, in another leading first-party case, developed an action in tort for bad faith withholding of insurance benefits. In *Gruenberg v Aetna Ins Co,* 9 Cal 3d 566; 108 Cal Rptr 480; 510 P2d 1032 (1973), the insured was allowed to recover all damages, including for mental distress, caused by the insurer's scheme to deprive the insured of benefits due on a fire insurance policy. The agent encouraged the bringing of criminal charges against the insured by falsely implying that he had a motive to commit arson, and, knowing that the insured would not appear for an insurance examination during the pendency of criminal charges, the insurer relied on the failure to appear as a pretense for denying liability on the policy. This Court in *Kewin* expressly declined to follow *Gruenberg.*

was far less egregious.[21] In most of the cases where

[21] Despite numerous claims asserting that an insurer's behavior was outrageous and inflicted emotional distress, there are relatively few cases in which the claim survived a motion for summary judgment and even fewer in which damages have been awarded. In addition to California, recovery has been allowed in Alabama, Indiana, Florida, and Washington, and in federal courts in perceived application of Virginia, Oregon, and Illinois law.

The Alabama Supreme Court affirmed a jury verdict on claims of malicious prosecution and intentional infliction of emotional distress in *National Security Fire & Casualty Co v Bowen*, 447 So 2d 133 (Ala, 1983). The conduct of the private investigators hired by National Security to investigate the fire loss of equipment included flashing their badge, bribing or threatening persons they interrogated to implicate the insured in arson, and physically threatening the insured at gunpoint after forcing him off the road. The court characterized such conduct as "so atrocious and so barbaric . . . that no civilized person could be expected to endure the acts committed without suffering mental distress."

In *Vernon Fire & Casualty Ins Co v Sharp*, 264 Ind 599; 349 NE2d 173 (1976), the Indiana Supreme Court found that the insurer's attempt to exact additional consideration from the plaintiff with regard to a separate lawsuit before performing its obligations under the contract was "intentional and wanton" conduct and affirmed a jury award of punitive damages.

The complaint in *Dominguez v Equitable Life Assurance Society*, 438 So 2d 58 (Fla App, 1983), aff'd 467 So 2d 281 (Fla, 1985), stated a cause of action for outrageous conduct where the insured alleged that the insurer's agent falsely represented that she had a letter from a doctor saying that the plaintiff was not disabled and that coverage of the policy was no longer in force and attempted to obtain the plaintiff's signature surrendering the policy. In *World Ins Co v Wright*, 308 So 2d 612 (Fla App, 1975), cert den 322 So 2d 913 (Fla, 1975), the court affirmed a jury award for intentional infliction of emotional distress where an insured's bad-faith conduct included attempts to "buy up" the policy. No additional facts were given. And in *Miller v Mutual of Omaha Ins Co*, 235 So 2d 33 (Fla App, 1970), cert den 238 So 2d 423 (Fla, 1970), a jury verdict was affirmed, and a judgment notwithstanding the verdict reversed, on a count of intentional infliction of emotional distress where an insurer's salesman went to the plaintiff's home after she became ill and charged that she had taken out the policy with knowledge of prior illness. The agent then physically took the policy from the plaintiff and walked out the door.

In *Rounds v Union Bankers Ins Co*, 22 Wash App 613; 590 P2d 1286 (1979), the Washington intermediate appellate court affirmed a denial of a motion to dismiss a claim for emotional distress for cancellation of a hospital policy.

A United States district court in Virginia held that allegations that an insurer issued an insurance policy without the intent to perform, and in bad faith refused to pay cancer benefits, stated a cause of

there has been an actual recovery, the circumstances are close to the facts of the insurance case described in Illustration No. 12 in the commentary accompanying the Restatement. The behavior, in cases where the behavior was found to have been tortious, is readily distinguishable from unfair claim-settlement practices that are not combined with verbal or physical assaults or threats.[22]

action for intentional infliction of emotional distress. *Morgan v American Family Life Assurance Co of Columbus,* 559 F Supp 477 (WD Va, 1983).

The United States Court of Appeals for the Ninth Circuit, applying Oregon law, affirmed a jury's conclusion in *Green v State Farm Fire & Casualty Co,* 667 F2d 22 (CA 9, 1982), that the behavior of a State Farm agent was "outrageous" where, after the State Farm adjuster knew that the state police had abandoned the investigation of Green for arson, the adjuster identified himself as a policeman and questioned Green's neighbors about the fire, implying that Green had set it and told Green that he would be charged with arson if he pressed his claim against State Farm.

The decision of the United States district court in Illinois in *Strader v Union Hall* is discussed in n 3 *supra,* and the Seventh Circuit's application of Illinois law in *Eckenrode v Life of America* is discussed in n 4 *supra.*

In many of the cases where recovery of emotional distress damages against an insurance company was not allowed, the courts, in dicta, indicated that recovery might be allowed in another case. See, for example, *Jarvis v Prudential Ins Co of America,* 122 NH 648; 448 A2d 407 (1982), n 22 *infra, Metropolitan Life Ins Co v McCarson,* n 2 *supra,* and *Employers' Fire Ins Co v Love It Ice Cream Co,* 64 Or App 784; 670 P2d 160 (1983), stating that an insurer's egregious conduct amounting to outrageous conduct—independent of bad-faith refusal to pay—could give rise to a tort action.

[22] In some cases where the conduct was more egregious than the simple nonpayment or denial of benefits, the courts have denied recovery in tort.

In *Cluff v Farmers Ins Exchange,* 10 Ariz App 560; 460 P2d 666 (1969), the Arizona intermediate appellate court concluded that an insured failed to state a claim for intentional infliction of emotional distress based on the actions of an insurance adjuster who attempted to "threaten and cajole" the insured to accept a settlement for the wrongful death of her son without the benefit of counsel. The Illinois intermediate appellate court concluded that an insurer's denial of liability under a disability policy, referral of the claim between offices and offer to repurchase the policy in settlement of a disputed claim did not state a cause of action for intentional infliction of emotional distress. *Debolt v Mutual of Omaha,* n 5 *supra.* In *Jarvis v Prudential Ins Co of America,* n 21 *supra,* an insurance company terminated

The opinion of the Court states that the Court of Appeals has, at least implicitly, acknowledged the viability of the intentional infliction theory in insurance actions alleging dilatory handling of claims. In none of the cited cases, however, did the Court of Appeals affirm a money judgment awarded on that theory for the plaintiff.[23]

---

reimbursement for nursing services in disregard of a provision in a policy indicating that some services were indeed compensable; the New Hampshire Supreme Court concluded, as a matter of law, that this was not "outrageous conduct." And in *Farris v United States Fidelity & Guaranty Co,* 284 Or 453; 587 P2d 1015 (1978), the Oregon Supreme Court concluded that an insurer's refusal to defend its insured under a liability policy, with knowledge that it has no good reason not to perform, did not justify recovery for emotional distress or punitive damages.

[23] The Court of Appeals has generally concluded that the plaintiff failed to establish a prima facie case of intentional infliction of emotional distress. See *Butler v DAIIE,* 121 Mich App 727; 329 NW2d 781 (1982), where the Court concluded that the plaintiff pled nothing more than a breach of an insurance contract. In *Harris v Citizens Ins Co,* 141 Mich App 110; 366 NW2d 11 (1983), where plaintiff sought recovery on the ground that the insurance agent had intentionally inflicted emotional distress by unreasonably refusing to pay or unreasonably delaying payment of certain no-fault benefits, the Court of Appeals concluded that the "complained-of conduct . . . does not, as a matter of law, rise to the level of 'extreme and outrageous' conduct." See also *Butt v DAIIE,* 129 Mich App 211, 219; 341 NW2d 474 (1983), holding that the trial court erred by denying defendant's motion for summary judgment on plaintiff's claim for intentional infliction of emotional distress. The complained-of conduct—requests for verification of replacement service before payment of benefits—"falls far short of the conduct which is considered tortiously outrageous." The plaintiff, in *Hall v Citizens Ins Co,* 141 Mich App 676; 368 NW2d 250 (1985), failed to establish a prima facie case of intentional infliction of emotional distress where the insurer erroneously pursued a subrogation claim against the wrong Patricia Hall, resulting in the garnishment of her paycheck. Most recently, in *Hajciar v Crawford & Co,* 142 Mich App 632; 369 NW2d 860 (1985), it was alleged that workers' compensation benefits were terminated to coerce the worker into accepting a lump-sum payment which he had previously refused. The Court of Appeals, recognizing that the intentional infliction of emotional distress constitutes a distinct and separate cause of action, concluded that the plaintiff did not allege conduct that might properly be characterized as outrageous and atrocious.

Statements in decisions of the Court of Appeals indicating that it has adopted the definition set forth in Restatement Torts, 2d, § 46, providing that a cause of action is made out by proof of "extreme and outrageous conduct [which] intentionally or recklessly causes severe

emotional distress to another," do not indicate that such a cause of action could be established on evidence of an insurer's dilatory handling of a claim. This appears on a comparison of the facts in often cited Court of Appeals cases. In *Warren v June's Mobile Home Village & Sales, Inc,* 66 Mich App 386; 239 NW2d 380 (1976), the Court of Appeals quoted extensively from both the Restatement of Torts and the accompanying commentary defining the type of situations where liability may result. The Court held that a landlord's actions in verbally harassing the plaintiff in retaliation for her complaints about electric bills, and his attempts to defeat plaintiff's sale of her mobile home, did not constitute the tort of intentional infliction of emotional distress. The Court said, in part, that the defendant may have simply been relying on his legal right to refuse a prospective tenant in the trailer park he owned. The United States Court of Appeals for the Sixth Circuit, applying Michigan law in *Ross v Burns,* 612 F2d 271 (CA 6, 1980), looked to the standards of § 46 to determine that a newspaper's publication of photographs of an undercover police officer in a public place, along with his identity, did not amount to "extreme and outrageous conduct." Similarly, in *Fry v Ionia Sentinel-Standard,* 101 Mich App 725; 300 NW2d 687 (1980), the Court held that a newspaper report of the accidental death of the plaintiff's husband and that a female body was found with his, did not constitute "outrageous" conduct. Cf. *Ledsinger v Burmeister,* 114 Mich App 12; 318 NW2d 558 (1982), where the Court concluded that the plaintiff stated a cause of action for intentional infliction of emotional distress on allegations of racial epithets uttered by a retail merchant while ejecting Ledsinger from his place of business. And in *Rosenberg v Rosenberg Bros Special Account,* 134 Mich App 342; 351 NW2d 563 (1984), the Court concluded that a widow's complaint that her deceased husband's brother engaged in a course of extreme and outrageous conduct to inflict severe emotional distress on her for the purpose of forcing her to sell her interest in her deceased husband's business stated a claim upon which relief could be granted.

In often cited *Frishett v State Farm Mutual Automobile Ins Co,* 3 Mich App 688; 43 NW2d 612 (1966), *lv den* 378 Mich 733 (1966), the plaintiff alleged that agents of an insurance company made false statements, unjustly withheld payment of benefits, and misused private information, and as a result the plaintiff became distressed and suffered emotional upset. The Court of Appeals reversed a summary judgment for the defendant, granted on the basis that Michigan courts do not allow recovery for mental distress unless accompanied by a physical injury, and stated that "the law of Michigan as set forth in *Stewart v Rudner* [349 Mich 459; 84 NW2d 816 (1957)] and *Carter v General Motors Corp* [361 Mich 577; 106 NW2d 105 (1960)] is consistent with the principles enunciated in the Restatement of the Law 1948 Supp, Torts § 46 . . . ." In *Stewart v Rudner,* this Court affirmed a jury verdict against the defendant doctor for mental distress damages arising out of the breach of a contract to perform a Caesarean section. This Court has said that an exception, allowing the recovery of mental distress damages, to the general limitation on the damages recoverable for breach of contract was made in *Stewart* because of the "personal nature" of the contract. *Kewin v Massachu-*

The courts in a number of states that have adopted the substance of a model act proposed by the National Association of Insurance Commissioners[24] have generally declined to formulate a com-

_setts Mutual Life Ins Co, supra,_ 409 Mich 415-416. At the same time this Court in _Kewin_ held that insurance contracts are commercial in nature and do not come within the reach of _Stewart._ In _Carter v General Motors,_ this Court recognized that mental injury may result from emotional stress although there was no physical effect and permitted recovery of workers' compensation benefits under the circumstances. Neither _Stewart_ nor _Carter_ relied on § 46 or the concept of "outrageous conduct," nor did either case involve the dilatory handling of an insurance claim.

Finally, the Court of Appeals said in _Holmes v Allstate Ins Co,_ 119 Mich App 710, 714; 326 NW2d 616 (1982):

"Although there has been confusion regarding a cause of action for intentional infliction of emotional distress, as distinguished from damages for mental anguish incident to an independent tort, and the Michigan Supreme Court has not ruled on this issue, the Michigan Court of Appeals has delineated intentional infliction of emotional distress as a separate cause of action which is not necessarily parasitic to another cause of action as an aggravating element of damages."

On the basis of the standards set forth in the Restatement Torts, 2d, § 46, the Court agreed with the trial judge that the erroneous termination of plaintiff's workers' compensation benefits when he failed to attend vocational rehabilitation and failure to give permission for treatment of plaintiff's back did not present evidence of an intent to cause plaintiff severe emotional distress, nor was there any conduct that could be viewed as "extreme and outrageous." Defendant's motion for directed verdict was properly granted.

[24] "Section 4. Unfair Methods of Competition and Unfair or Deceptive Acts or Practices Defined.

The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:

* * *

"(9) Unfair Claim Settlement Practices.

Committing or performing with such frequency as to indicate a general business practice any of the following.

(a) misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(b) failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d) refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

mon-law remedy for unfair claim-settlement practices.[25] Michigan has enacted that legislation.[26]

---

(f) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(g) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

(h) attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

(i) attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

(j) making claims payments to insureds or beneficiaries not accompanied by statement setting forth the coverage under which the payments are being made;

(k) making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

(l) delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(m) failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

(n) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." *An Act Relating to Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance,* § 4(9), in Ashley, Bad-Faith Actions Liability and Damages, Appendix I, pp 2, 6-7.

[25] The Supreme Courts of Pennsylvania, Kansas, Minnesota, New Hampshire, Oregon, and the intermediate appellate courts of Illinois, and federal district courts in perceived application of Illinois law, have relied on statutory provisions in declining to award emotional distress damages or to recognize a common-law cause of action.

The Pennsylvania Supreme Court, in *D'Ambrosio v Pennsylvania National Mutual Casualty Ins Co,* 494 Pa 501, 507-509; 431 A2d 966 (1981), said that the insured may not supplement remedies in the Pennsylvania Unfair Insurance Practice Act by an action to obtain damages for emotional distress.

In Kansas, the legislative provisions authorizing certain penalties, including imposition of costs and attorney fees, against an insurer for lack of good faith were seen as sufficient remedies and as an indication that the legislature did not intend damages for emotional suffer-

ing to be recoverable by an insured through a tort action for bad faith. See *Spencer v Aetna Life & Casualty Ins Co,* 227 Kan 914, 923-924; 611 P2d 149 (1980).

The Minnesota Supreme Court, in *Haagenson v National Farmers Union Property & Casualty,* n 2 *supra,* denied emotional distress damages, but the insured was entitled to recover the ten percent statutory penalty for delay in payment of no-fault benefits.

In *Lawton v Great Southwest Fire Ins Co,* 118 NH 607, 613-615; 392 A2d 576 (1978), the availability of legislative remedies militated against the recognition of an independent action in tort for an insurer's wrongful refusal to settle or delay in settling a first-party insurance claim.

The Oregon Supreme Court rejected a claim for emotional distress damages in the third party context saying "[i]t was certainly not intended by the legislature that additional pressure to perform the contract be exerted by allowing the recovery of damages for emotional distress, since the statute provides for civil damages recoverable by the state for that purpose." *Farris v United States Fidelity & Guaranty Co,* 284 Or 453, 458; 587 P2d 1015 (1978).

And the Illinois appellate court said, "[W]here the legislature has provided a remedy on the subject matter we are not only loathe but in addition harbor serious doubts as to the desirability and wisdom of implementing or expanding the legislative remedy by judicial decree." *Debolt v Mutual of Omaha,* n 5 *supra.* Accord *Smith v Metropolitan Life Ins Co,* 550 F Supp 896, 899-900 (ND Ill, 1982); *Anderson v Mutual of Omaha Ins Co,* 594 F Supp 726 (SD Ill, 1984).

[26] "Sec. 2026. (1) Unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, other than isolated incidents, are a course of conduct indicating a persistent tendency to engage in that type of conduct and include:

(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue.

(b) Failing to acknowledge promptly or to act reasonably and promptly upon communications with respect to claims arising under insurance policies.

(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

(d) Refusing to pay claims without conducting a reasonable investigation based upon the available information.

(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.

(f) Failing to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

(g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due the insureds.

(h) Attempting to settle a claim for less than the amount to which a reasonable person would believe the claimant was entitled, by reference to written or printed advertising material accompanying or made part of an application.

## IV

The underlying premise of the present controversy is that the defendant insurer unreasonably withheld payment of benefits owing to the plaintiffs. The issue presented by this appeal—unjustified litigation in the insurance context—is a subset of the larger problem of unjustified commencement of actions and unjustified defense.

In *Friedman v Dozorc, supra*—a countersuit commenced by physicians against lawyers who had previously unsuccessfully brought a malpractice action against them—this Court was asked to modify the common law to provide an expanded tort remedy by eliminating the special injury requirement in actions for malicious prosecution. In declining to do so, this Court said:

> Most commentators appear to favor abrogation of the special injury requirement to make the action more available and less difficult to maintain. Their counsel should, however, be evaluated skeptically. The lawyer's remedy for a grievance is

(i) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured.

(j) Making a claims payment to a policyholder or beneficiary omitting the coverage under which each payment is being made.

(k) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration.

(l) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring subsequent submission of formal proof of loss forms, seeking solely the duplication of a verification.

(m) Failing to promptly settle claims where liability has become reasonably clear under 1 portion of the insurance policy coverage in order to influence settlements under other portions of the insurance · policy.

(n) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." MCL 500.2026(1)(a)-(n); MSA 24.12026(1)(a)-(n).

a lawsuit, and a law student or tort professor may be particularly predisposed by experience and training to see the preferred remedy for a wrongful tort action as another tort action. In seeking a remedy for the excessive litigiousness of our society, we would do well to cast off the limitations of a perspective which ascribes curative power only to lawsuits. [412 Mich 42.]

I remain of the opinion, expressed at the time *Friedman v Dozorc* was decided,[27] that it is this Court's obligation to provide a means of addressing the problem of unjustified litigation, a problem that confronts all litigants and potential litigants —plaintiffs and defendants. I question whether an expansion of tort remedies and more litigation is the correct response.

If the basis of the plaintiff's claim is the interposition of an unwarranted defense, it might be difficult to confine the scope of the action to a claim by an insured against an insurer. Since the commencement of this action, this Court has adopted a court rule, MCR 2.114(D) and (E),[28]

---

[27] *Friedman v Dozorc, supra,* p 57 (LEVIN, J., *concurring*).

[28] "(D) Effect of Signature. The signature of an attorney or party, whether or not the party is represented by an attorney, constitutes a certification by the signer that

"(1) he or she has read the pleading;

"(2) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and

"(3) the pleading is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

"(E) Sanctions for Violation. If a pleading is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, including reasonable attorney fees." MCR 2.114.

providing that an "appropriate sanction" may be imposed on a party who maintains an action or interposes a defense not based on a belief, "formed after reasonable inquiry," "well grounded in fact," or for the purpose of "harass[ment] or to cause unnecessary delay." If this Court were to hold that a common-law action can be maintained against an insurer for breach of the obligation to refrain from interposing a defense except upon a belief, "formed after reasonable inquiry," "well grounded in fact," and not for the purpose of "harass[ment] or to cause delay," then one would think such an action should also be maintainable against any defendant or plaintiff and his lawyer who breaches that obligation. The obligation of an insurer to an insured is not a higher obligation than that owed by a lawyer to the court.

If that view is sound, then recognition of an action in tort for unjustified litigation may open the door to countersuits in a large number of cases. Physicians turned back in *Friedman v Dozorc,* might be encouraged to assert a claim of unwarranted or unjustified litigation against a plaintiff who has filed a medical malpractice action, and a plaintiff in such an action might be enabled to respond with a like claim against the physician who, it might be alleged, should have acknowledged the wrongdoing rather than have attempted to cover it up. The lawyers representing the parties might also find themselves subjected to suit. Once this becomes fashionable, I expect a deluge of litigation and attendant increase in the cost of insurance long before this Court is likely to respond to the questions that it has left open by its pronouncement today.

I would favor enlarging the recently adopted court rule to expressly permit the assessment of

the amount of all actual pecuniary loss[29] against a person—plaintiff or defendant—and his lawyer maintaining unjustified litigation, as suggested in *Friedman v Dozorc*. The sum recoverable should include all fees and administrative charges incurred because of the litigation, as well as reasonable attorney fees. The judge could also award a prevailing litigant an additional sum for loss of income-producing time or business attributable to the wrongful maintenance of the action if the amount is capable of being calculated with reasonable certainty. The sum recoverable would be determined in a prompt post-trial hearing before the judge who presided during the original action, and the rule should allow for the presentation of evidence, including testimony of witnesses, and appellate review.

Having such a determination made by a judge, in this framework, has a number of advantages over allowing a jury to award damages for emotional distress. First, a strategy for evaluating the propriety of litigation which is administered exclusively by judges is more susceptible of consistent application and careful supervision than a strategy which relies on a group of laymen chosen at random often for one day and one trial. Second, the meritorious question whether a defendant is subject to liability to the plaintiff for breach of contract or otherwise and, if so, the amount of the damages, is tried without the opportunities for confusion and prejudice attendant to allowing the trial at the same time of both the meritorious question and the separate question whether the defendant (or, indeed, the plaintiff) acted outrageously in defending (or commencing) the action. Third, limiting recovery to actual pecuniary loss,

---

[29] The present rule speaks of an "appropriate sanction." See n 28 for text. Arguably this might comprehend "all actual pecuniary loss."

and thus not allowing recovery for emotional distress, and relying on a judge to assess damages, combined with the greater control that appellate courts exercise over judge's findings as compared to a jury's verdict, should tend to avoid excessive awards which might intimidate good-faith litigants.[30]

Such an enlargement of the court rule, and enforcement of the court rule, would go a long way towards addressing the problem that, in a few states, has been addressed by the recognition and application in the insurance context of the so-called tort of outrage.

---

[30] *Friedman v Dozorc, supra,* pp 61-62 (LEVIN, J., *concurring*).